FILED

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2016 JUL 12 P 4: 48

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| KROLL ASSOCIATES, INC., | Civil Action No. 1:16cv887 |
| Plaintiff, | TSE/JFA |
| vs. | |
| JEFFREY CRAMER, | |
| Defendant. | |

## VERIFIED COMPLAINT

Plaintiff Kroll Associates, Inc. ("Kroll", the "Company", or "Plaintiff"), by and through its undersigned attorneys, and for its Complaint against Defendant Jeffrey Cramer ("Defendant" or "Cramer"), hereby alleges as follows:

## NATURE OF ACTION

1.     Kroll brings this action to enforce the contractual post-employment obligations of Defendant Cramer—one of Kroll's most highly paid former Senior Managing Directors and Regional Office heads—to safeguard Kroll's confidential, proprietary, and trade secret information, to prevent unfair competition and irreparable injury to Kroll's legitimate business interests, and to protect its clients and employees, and the goodwill of its business that Kroll has developed over many years and at significant expense.

2.     When Cramer was hired by Kroll in 2009 directly from the U.S. Attorney's office—and with no prior work experience in the risk consulting business—to head Kroll's Chicago office and serve as a Managing Director in the Company's Investigations & Disputes

("I&D") practice, he brought no clients with him. For more than seven (7) years, Kroll paid Cramer extraordinary compensation and invested significant financial and personnel resources, so that Cramer could use Kroll's platform and reputation to expand Kroll's existing client relationships and develop new ones.

3. As a senior executive, Cramer was given access to the key principals at many of Kroll's top revenue clients, and confidential information regarding Kroll's business plans and strategies for further growth, as well as confidential information about Kroll's clients. In selling Kroll's services, Cramer had the benefit of Kroll's highly proprietary and closely guarded network of global subcontractors who facilitate Kroll's retention on matters globally. In order for Kroll to protect its significant investment of time, resources and personnel, and also to protect its clients' confidential and proprietary information, at all times during his employment at Kroll, Cramer was subject to various confidentiality and restrictive covenant agreements.

4. In December of 2014, in connection with his promotion to Senior Managing Director and a significant compensation increase, Cramer was offered the opportunity to participate in the Company's Long-Term Incentive Plan (the "LTIP"). As a condition of his participation in this program, which was offered only to a select group of Kroll senior executives, Cramer was required to sign a new restrictive covenant agreement, the "Confidentiality, Non-Solicitation and Proprietary Rights Agreement" (the "2014 CNPR"). Cramer agreed to participate in the LTIP, and accepted and signed the 2014 CNPR.

5. Under the 2014 CNPR, Cramer acknowledged and agreed that in his capacity as a Senior Managing Director with the Company, Kroll placed him in a "position of trust and confidence" in which he had access to and knowledge of Kroll's and its clients' confidential information and trade secrets. Cramer also acknowledged and agreed to other obligations

-2-

including a twelve (12) month non-competition agreement; a twelve (12) month non-solicit of Kroll's clients, about which he obtained confidential information during his employment and/or with which Cramer had business dealings for the twelve (12) months preceding his resignation from Kroll; a twelve (12) month non-solicit of Kroll's employees; and a three (3) year embargo on disclosing or using any of Kroll's confidential information and an indefinite prohibition on disclosing any trade secrets.

6.      Despite his promotion, salary increase, and participation in the LTIP, during the year prior to his resignation, Cramer spent significant time focused on seeking other opportunities and compensation for himself at the expense of doing the job he was being paid generously to do.

7.      Cramer resigned from Kroll effective May 13, 2016.  Notwithstanding his restrictive covenants, Cramer informed Kroll that he planned to join the Chicago office of Kroll's direct industry competitor, Berkeley Research Group ("BRG").  On June 28, 2016, BRG issued a press release announcing that Cramer had joined its Chicago office as Managing Director in its Global Investigations and Strategic Intelligence practice.  By working at BRG in clear violation of his 2014 CNPR, Cramer has caused and will continue to cause Kroll irreparable harm by using the trade secrets and confidential information he learned as a Kroll senior executive, and the unique access he was given to Kroll's clients, to unfairly dislodge or diminish Kroll's relationships with its clients, in which it has invested enormous resources to develop.

8.      In addition, prior to his departure, Cramer breached his non-solicitation obligation under his 2014 CNPR by contacting Kroll's clients in an apparent attempt to move their business to BRG.  Moreover, since Cramer's move to BRG in June, three (3) Kroll I&D employees in the

-3-

Chicago office, all of whom had worked closely with Cramer at Kroll, announced their resignations to join Cramer at BRG—moves which BRG's in-house recruiter recently bragged "decimated Kroll's Chicago office." During that same time frame, BRG actively solicited the longstanding head of Kroll's Buenos Aires, Argentina office (a Kroll Managing Director with whom Cramer had worked), who announced his resignation from Kroll to join BRG on or around June 23, 2016, and it also used Cramer's presence at BRG to solicit the longstanding Senior Managing Director and head of Kroll's San Francisco office.

9.    The full extent to which Cramer breached his obligations has been obscured by Cramer's brazen conduct in erasing, without authorization, his Company smartphone before turning it back in. This wiping was in flagrant violation of his 2014 CNPR and Company policy, and a breach of his fiduciary obligations to Kroll.

10.    Cramer has since made clear in a letter from his lawyers that at BRG he has every intention of immediately soliciting Kroll's current clients, claiming that he has the right to do so because those clients are *his own* "contacts and relationships." Moreover, Cramer, who as a Senior Managing Director was given access to some of Kroll's and its clients' most sensitive and highly guarded information, has advised Kroll that he does not consider **any** of the information he received about Kroll during his employment to be confidential or trade secrets, placing this protected information at severe risk absent injunctive relief.

11.    Unless Cramer is enjoined from continuing his employment with Kroll's direct competitor, BRG, until at least May 13, 2017—per the terms of his 2014 CNPR—Kroll will suffer further irreparable damages. In the absence of such relief, Cramer will continue to improperly use Kroll's confidential information and trade secrets and use client contacts that he received as one of the highest paid executives at Kroll to solicit those clients to leave Kroll for

BRG. Cramer should be held liable for his breaches of his contractual, common law, and fiduciary obligations to Kroll, and be prevented from inflicting any further harm on Kroll.

## PARTIES, JURISDICTION, AND VENUE

12.     Plaintiff Kroll is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York. Kroll regularly solicits clients and conducts business throughout the world, including within the Commonwealth of Virginia.

13.     Upon information and belief, Cramer is an individual residing in Glenview, Illinois.

14.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this is an action between the citizens of different States, and the amount in controversy exceeds $75,000 exclusive of interests and costs.

15.     Personal jurisdiction exists as to Cramer because the 2014 CNPR contains an exclusive jurisdiction clause in which the parties expressly consented to personal jurisdiction in "the state and federal courts located in or having jurisdiction over Fairfax County, Virginia." Ex. A at 8.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(3) because the 2014 CNPR contains an exclusive venue clause that states "exclusive venue and forum for any legal action arising from this Agreement is a court of competent jurisdiction in Virginia." Ex. A at 8.

## FACTUAL ALLEGATIONS

### Overview of Kroll

17.     Since its founding more than 40 years ago, Kroll, together with its affiliates, has established itself as a leading provider of risk solutions, specializing in identifying, remediating and monitoring risk on behalf of global clientele, through offices located throughout the world.

Kroll provides a range of investigative, advisory, intelligence, financial, security, compliance, and technology services to private and public sector clients.

18.     Kroll is divided into several main business segments, including, among others, Investigations and Disputes and Compliance. Kroll provides professional investigative consulting expertise necessary to resolve conflicts through fact-finding and critical analysis. The I&D business has conducted thousands of investigations worldwide and has an unmatched track record of helping clients resolve disputes and working with counsel to successfully conduct and conclude, among other things, internal or regulatory inquiries. I&D's capabilities include, *inter alia*, asset searches, brand protection, financial investigations, regulatory investigations, forensic accounting, dispute advisory services, internal investigations, litigation support, business intelligence, proxy contests, monitorships and cyber-crime investigations.

19.     Kroll's Compliance segment is a market-leading provider of solutions that help clients comply with the myriad of anti-money laundering and anti-bribery and corruption regulations worldwide. Through a combination of in-depth subject matter expertise, global research capabilities, and flexible technology, the Compliance practice helps clients (1) design, set up and implement compliance programs and policies; (2) establish overarching compliance strategy and culture, including firm-wide training programs; (3) manage third party risks leveraging Kroll's Third Party Compliance portal, a web-based volume due diligence, governance and compliance platform; (4) take a risk-based approach to compliance through a broad range of Screening and Monitoring Services and Enhanced Due Diligence capabilities; and (5) respond to potential risks through Kroll's investigative, remediation, and look-back solutions.

20.     Kroll has several direct competitors, including BRG, but maintains a competitive edge over those other companies through, among other things, its years of service and industry

leading reputation and its highly experienced personnel. Kroll's success is also attributable to its
ability to attract new clients and retain existing clients for multiple matters and over the long
term. Kroll's global roster of clients was developed through Kroll's substantial investment both
financially and in terms of personnel. Given the considerable time and expense to acquire new
clients, Kroll's business strategy focuses on working with clients over a long period of time on
multiple matters, rather than on an ad-hoc basis. For example, approximately 43 percent of
Kroll's fee revenue over the past six (6) years is derived from North American clients who have
used Kroll's services in at least five (5) out of the past six (6) years. Even in instances where one
Kroll employee originates a client relationship, many of Kroll's valuable employees are
integrated into each client's projects and thus contribute to client retention.

21.     A core component of Kroll's work in the I&D and Compliance spaces is a highly
proprietary network of subcontractors (the "Global Subcontractor Network"), which allows Kroll
to handle projects virtually anywhere in the world. Kroll developed this Global Subcontractor
Network over a number of years and at great expense, carefully vetting the members of the
network to ensure that they possess the requisite level of skill and expertise for Kroll's matters,
as well as the integrity and discretion to be trusted with client confidences. The identities of
these contractors are highly confidential and competitively-sensitive, and, other than in
extraordinary circumstances, they are not disclosed to third parties. The subcontractors are
highly skilled professionals who work closely with Kroll's employees and can perform work in
geographic areas where, for example, Kroll does not have offices or personnel.

22.     The competitive significance and sensitivity of this Global Subcontractor
Network and the need to maintain its confidentiality cannot be overstated. The United States
Bankruptcy Court for the District of Delaware recently held that the disclosure of the identities

-7-

of individuals in Kroll's Global Subcontractor Network "would unfairly benefit Kroll's

competitors." *In re Altegrity, Inc.*, No. 15-10226, Dkt. No. 721, at *7 (Bankr. D. Del. July 6,

2015). In so holding, the court also recognized, with regard to Kroll's employees as well as its

subcontractors, that Kroll's "primary assets are the individuals critical to the delivery of the

services" it provides, that "the acquisition and retention of talent is vital to [Kroll's] success,"

and that "Kroll has expended considerable effort and money to develop its network of

Independent Contractors, and the Independent Contractors are highly susceptible to solicitation."

*Id.*

### Cramer's Employment with Kroll and the 2014 CNPR

23.     On or about October 5, 2009, Kroll hired Cramer from the U.S. Attorney's Office

in Chicago, where he had spent nine (9) years as an AUSA. He was hired as a Managing

Director and as the head of Kroll's Chicago, Illinois office. Because Cramer had no prior

experience working on behalf of private industry clients in the I&D space or providing

consulting services of the type offered by Kroll and did not join Kroll with any "book of

business" or clients, his success at Kroll was dependent in large part on his ability to use the

Kroll platform, reputation, and resources—including its skilled employees in the Cybersecurity,

I&D, and Compliance spaces and Kroll's Global Subcontractor Network— to expand and

service Kroll's existing client relationships and to develop new ones. As a condition of his

employment and at all times during his employment with the Company, Cramer was subject to

confidentiality agreements and restrictive covenants designed to protect Kroll's confidential

information, clients and employees for a period of at least twelve (12) months following his

departure from the Company.

24.     In September 2014, Kroll promoted Cramer to the position of Senior Managing

Director, raising his total compensation to close to seven (7) figures and making Cramer among

the highest paid executives at Kroll.  Kroll's then-Chief Executive Officer wrote a letter to

Cramer on September 2, 2014, providing the terms of Cramer's promotion and compensation

increase, and also described the terms of Kroll's LTIP, which Cramer was invited to participate

in.  A redacted copy of Cramer's executed LTIP participation notices, with annexes, is attached

hereto as Exhibit A.

25.     The LTIP provided a select number of Kroll's key executives with the opportunity

to share in the Company's fiscal growth by receiving awards of "Units" representing the right to

future payment at the time of a sale of the Company or an initial public offering (a "Triggering

Event"), and was intended to incentivize such executives to stay with the Company over the long

term.  Cramer was granted 400,000 Units, each with a base price of $1.00, the payout value of

which could increase based on Kroll's EBITDA performance as measured at the time of a

Triggering Event.  The LTIP provided Cramer the prospect of being awarded substantial six-

figure or seven-figure compensation, had he remained with Kroll and helped continue to grow

the company.  These Units vested incrementally over the course of a four year period and

Cramer's first tranche of units (25%) fully vested in December 2015.

26.     As a condition of his participation in the LTIP, Cramer agreed to the terms of the

2014 CNPR, which was included as a part of the LTIP agreement and expressly prohibits

Cramer, for a period of twelve (12) months following termination of his employment with Kroll,

from, among other things, interfering with Kroll's relationships with its employees, interfering

with Kroll's business relationships with its clients, or competing against Kroll. Specifically the

2014 CNPR's Protective Covenants provide, in relevant part:

During the twelve (12) month period immediately following the end of your employment with Company, you will not:

a) interfere with the Company's relationships with its employees, by: (i) soliciting or communicating with an employee to induce or encourage him or her to leave Company's employ (regardless of who first initiates the communication); (ii) otherwise helping any person or entity hire an employee away from Company; or (iii) hiring an employee to work elsewhere (the "Employee Non-Solicitation Covenant");

b) interfere with Company's business relationships with a Covered Customer, by soliciting or communicating (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: (i) stop or reduce doing business with Company, or (ii) to buy a Competing Product or Service. The parties agree this restriction is inherently reasonable because it is limited to the locations where the Covered Customer does business (the "Client Non-Solicitation Covenant"); or

c) participate in, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) Competing Activities in the Restricted Area (the "Non-Competition Covenant").

Ex. A at 6-7.

27.     Pursuant to the 2014 CNPR, the terms "Covered Customer," "Competing Product or Service," and "Competing Activities" are defined as follows:

- A "Covered Customer" is a Company customer as to which [Cramer] received Confidential Information or had business dealings in the [one (1) year prior to the end of Cramer's employment with Company], but excludes any entity who ceased being a customer at least six (6) months prior to [Cramer's] termination (due to no fault of [Cramer]).

- A "Competing Product or Service" is a product and/or service, such that it would replace or compete with: a product and/or service Company provides to its customers; or a product or service that is under development or planning by Company but not yet provided to customers and regarding which you were provided Confidential Information. Competing products or Services do not include a product or service of the Company if the Company no longer provides such product or service to its customers at the relevant time of enforcement.

- "Competing Activities" are "any activities or services undertaken on behalf of a person or entity engaged in providing a Competing Product or Service that are the same or similar in function or purpose to those [Cramer] performed in [the period one (1) year

prior to the end of Cramer's employment with Company]. Competing Activities do not include: (i) activities on behalf of an independently operated business unit of a larger business that has division(s) that provide a Competing Product or Service so long as the business unit to whom [Cramer is] providing services does not provide a Competing Product or Service; or (ii) a passive and non-controlling ownership interest in less than 2% of the stock in a publicly traded company."

Ex. A at 5.

28.     The "Restricted Area" under the 2014 CNPR is the United States, and for

executives with confidential information pertaining to Kroll's international operations—to which

Cramer was given access—the Restricted Area also includes Europe, Latin America and Asia,

and any additional countries and territories where the Company markets its products and services

over the twelve (12) months prior to his resignation. In Cramer's 2014 CNPR, he expressly

agreed that "[t]his is a reasonable geographic area because you are expected to help Company

provide its products and services and create, receive and analyze Confidential Information

pertaining to such products and services throughout the Restricted Area."

29.     The 2014 CNPR also prohibits Cramer from engaging in any unauthorized use or

disclosure of Kroll's or its clients' confidential information (the "Nondisclosure Covenant").[1]

The restrictions on disclosure of confidential information apply for three (3) years following the

termination of Cramer's employment for information that does not qualify as a trade secret and

apply indefinitely for trade secret information. The 2014 CNPR broadly defines Confidential

Information as:

> Information or a compilation of information, in any form (tangible or intangible), related to the Company's that has not appropriately been made public and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use. Confidential Information includes, but is not limited to, the Company's business plans and analysis;

---

[1] The Non-Competition Covenant, Employee Non-Solicitation Covenant, Client Non-Solicitation Covenant, and the Nondisclosure Covenant are collectively referred to herein as the "2014 CNPR Restrictive Covenants."

financial information; pricing information; training information and programs; customer and prospective customer lists and contact information; customer buying histories, requirements, preferences, and specifications; vendor information and vendor history; referral source information; marketing plans, strategies and promotions; research and development data; buying practices; supplier information; employee data, organizational information, internal business methods and techniques; technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and information about the business affairs of third parties (including, but not limited to, customers, vendors and suppliers) that such third parties provide to the Company in confidence. Information that is intentionally disclosed or authorized for disclosure to the general public by Company is not considered Confidential Information. You acknowledge that items of Confidential Information are Company assets and have economic value because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of the Company, and thus, should be treated as trade secrets.

Ex. A at 4-5.

30.    The 2014 CNPR contains a choice of law provision that provides that "the laws of the state where [Cramer] regularly and primarily work[s] for the Company shall apply." Ex. A at 8. As set forth above, as the head of the Chicago, Illinois office, Cramer regularly and primarily worked for Kroll in Illinois.

31.    As a former AUSA, Cramer is a knowledgeable attorney who indisputably understood the restrictions to which he voluntarily agreed in exchange for substantial compensation and opportunities at Kroll. Indeed, Cramer expressly agreed that the 2014 CNPR Restrictive Covenants—including the Non-Competition Covenant—are "reasonable and necessary to protect the Company's legitimate business interests, including the protection of the Company's trade secrets, not against the public interest, and do not impinge on [his] ability to earn a living." Ex. A at 6.

32.    In addition to his various obligations under the 2014 CNPR, Cramer is also subject to various other obligations under the Company's Code of Conduct, which is expressly incorporated by reference into Cramer's 2014 CNPR. A copy of the Company's Code of

-12-

Conduct is attached hereto as Exhibit B. Specifically, Cramer acknowledged and agreed, among other things, that: (i) employees are expected to "[a]void conflicts of interest" and to "[p]rotect the Company's corporate assets" (Code of Conduct at 5); (ii) Company information "must be used only for [Company] business purposes" and "must be protected from inappropriate disclosure to clients, competitors, financial analysis, the media and other third parties," and that "[t]he duty to keep information in confidence continues even after [you] leave the [Company]" (*id*. at 13); and (iii) employees "may not take for [themselves] opportunities that are discovered through the use of Company property, information or position and may not use such property, information or position for personal gain" (*id*. at 17).

**Kroll's Investment in Cramer and Work With Kroll Clients**

33.     With the protections of these various restrictive covenants, Kroll provided Cramer, *inter alia*, extensive access to its existing clients, business development strategies, and the financial resources and experienced personnel to help him market and develop business on behalf of Kroll's existing and prospective clients. For example, in fiscal year 2015 and in the first half of fiscal year 2016, Kroll invested more than $2.2 and $1.2 million dollars, respectively, in marketing and business development to support its North American I&D business. As another example, in September 2015, at Cramer's urging and despite the Company having just emerged from bankruptcy, Kroll agreed to further invest in high end Chicago office space in the central business district by entering into a new long-term lease. This investment was designed to enhance Kroll's brand and image in the Chicago market and was made in reliance on Cramer's representations that he could further expand Kroll's business in that region.

34.     Kroll allocates credit to its billable employees based on the revenue they generate in connection with Kroll's clients. Employees receive origination revenue credit for revenue

-13-

generated by business originated by that individual, and managed revenue credit for revenue
generated on a matter managed by that individual. Regardless of whether the matter is originated
or managed by the Kroll employee, Kroll considers these clients to be clients of Kroll, as they
are the byproduct of Kroll's goodwill, financial investment in developing these clients,
investment in training and developing its employees to manage and service these clients, and the
Company's confidential information used in generating and servicing these clients.

35.     As the head of Kroll's Chicago Office, Cramer was the direct supervisor of not
only the employees in Chicago, but also the employees of Kroll's office in Texas. In fact,
Cramer supervised the majority of work performed for clients throughout the entire Midwest and
Texas and, as a result, received credit (toward his revenue generation metrics) for new clients
and revenue that flowed into Kroll in that territory, including those clients who initiated contact
with Kroll as a result of Kroll's extensive marketing efforts and industry reputation. In addition,
Cramer managed investigations from Chicago that were conducted by Kroll's team globally.
Cramer also was assigned to manage domestic and international matters brought in through other
Kroll offices that were transferred to the Chicago office, often for geographic and/or strategic
reasons. In his 2015 Performance Appraisal, Cramer acknowledged the "cases I generate are as
a result of my referrals from [other Kroll] clients." Clients thus often interfaced directly with
Cramer regardless of whether he was the individual who initially originated the client
relationship.

36.     Also in his 2015 Performance Appraisal, Cramer identified matters that he had
opened for clients in India, China, Argentina, Russia, and elsewhere. In a September 3, 2015
email, Cramer urged the global head of Kroll's I&D business to make Cramer the Global Head
of Investigations for Kroll because a large percentage of Cramer's work was based overseas.

37.     While Cramer received credits for numerous matters, the vast majority of Cramer's matters were serviced by other Kroll professionals, many from the Chicago office, but others from around and outside the United States.  Thus, Cramer spent a significant amount of his time acting as the "face" of the Chicago Office, travelling and entertaining clients at Kroll's expense, and giving interviews broadcast in the mass media, while others at Kroll performed the vast majority of the client work for Kroll's clients and produced the exceptional results that were instrumental to Kroll's ability to retain its clients.

38.     The Bankruptcy Court for the District of Delaware has also specifically recognized Kroll's investment in its clients, noting that Kroll has "spent significant sums to acquire, secure and develop their customers, and [Kroll] as well as [its] competitors would willingly pay a substantial sum to have access to the identity of their competitor's customers." *In re Altegrity, Inc.*, No. 15-10226, Dkt. No. 721, at *7 (Bankr. D. Del. July 6, 2015).

**Cramer's Unique Access to Confidential, Proprietary and Trade Secret Information**

39.     Cramer was one of only eight (8) North America Office Heads serving the U.S. market and fourteen (14) Senior Managing Directors at Kroll worldwide.  In that role, Cramer served as a high-level executive and fiduciary of Kroll, and had extensive access to highly confidential, corporate and trade secret information about Kroll, its clients, and its operations in Chicago and throughout North America and the rest of the world.  The identities of Kroll's clients are never revealed or acknowledged by Kroll, except in limited circumstances.

40.     For example, on a bi-weekly basis, Cramer, the other North America Office Heads, including Senior Managing Directors, and senior business leaders in Finance, Human Resources, and Marketing, and the global head of I&D , held telephonic meetings to discuss, *inter alia,* Kroll's strategic initiatives, including new target clients, industries and markets, client

-15-

development and pricing, employee compensation and bonus criteria, and financial information including profit and loss data and other metrics for each division of the business.

41.     Cramer also received information regarding Kroll's specific negotiation tactics for maximizing profitability and the extent of Kroll's willingness to fashion budgets in competitive situations, as well as which of Kroll's clients receive discounts or modified contract terms, and the details of those discounts and special terms.

42.     As a result of Cramer's work in Kroll's I&D business, he also was privy to how Kroll deploys its Global Subcontractor Network, as well as how it prepares the client reports that are the hallmark of Kroll's I&D work.

43.     Cramer also had extensive access to the confidential and often legally privileged information of Kroll's clients throughout his employment at Kroll.  In addition to the information Cramer gleaned about the clients for which he worked, Cramer was also privy to confidential information about many Kroll clients which he did not develop or manage, including but not limited to the identity of Kroll's largest clients by revenue and by number of cases, the amounts they spent on Kroll's services and their specific needs and preferences for various services offered by Kroll.  He learned of this information through regular internal communications involving Kroll's senior executives and at various high-level meetings, where new client business was discussed, including at the bi-weekly telephonic meetings with the North America Office Heads and other senior business leaders.

44.     Kroll's protective treatment of this information was recently recognized by a federal bankruptcy court.  Specifically, the Bankruptcy Court for the District of Delaware concluded that the services provided by Kroll, including, among others, investigations, compliance, cyber security, security risk management, and background investigations, "involve

confidential subject matters, and often the mere fact of engagement is a sensitive concern." *In re Altegrity, Inc.*, No. 15-10226, Dkt. No. 721, at *7 (Bankr. D. Del. July 6, 2015). The court further found that Kroll has (1) "consistently treated their customers' identities as highly proprietary, and their customers generally do not reveal to the public that they have retained [Kroll]"; and (2) Kroll requires "their vendors, employees, and others who learn the identity of customers to enter confidentiality agreements prohibiting the disclosure of this information." *Id.*

45.     For the last seven (7) years, Cramer had full access to this confidential information, which is otherwise available only to a limited number of senior level Kroll executives, and certainly not to any of Kroll's competitors.

46.     Access to Kroll's confidential information by any of its competitors would be detrimental to Kroll's business interests and would confer upon those competitors an unfair competitive advantage, where Kroll invested enormous time and resources in developing this confidential information. Accordingly, Kroll takes affirmative steps to ensure that this confidential information is appropriately safeguarded. For example, Kroll employs a Chief Information Security Officer who is responsible for regularly upgrading and updating its information security systems to protect Kroll against external and internal data breaches and cyber attacks. Kroll implements external firewalls, email protection programs to combat malware, and additional "exclusion protection devices" against external threats. Additionally, Kroll tracks employees' exportation of data through data-loss prevention tracking software to identify any employees who may attempt to take Company data without authorization. Furthermore, Kroll limits access to client data to only those employees with a valid need for specific data. On Kroll's shared network drives, access to folders pertaining to client cases in each Kroll office is restricted to the Kroll employees in such office who could potentially work

on such case. Kroll also classifies some cases as "restricted," meaning that access is limited to only those very few employees within Kroll who are actively working on such restricted cases.

**Cramer Shirks His Responsibilities And Resigns From Kroll to Join BRG**

47.     From a review of Cramer's Company emails and text message history, it is apparent that beginning in the fall of 2015 and continuing through the winter and spring of 2016, Cramer was actively exploring employment opportunities with direct competitors, including BRG. During that time, Mr. Cramer was also actively seeking to negotiate an even more lucrative compensation package for himself at Kroll.

48.     As the head of the Chicago office, among other things, it was Cramer's responsibility to recruit new employees and retain existing employees. In October 2015—after the departures of a Managing Director and Associate Managing Director—Cramer was specifically instructed to actively recruit and hire talented professionals to grow the Chicago office, which was a priority for Kroll. But, despite this instruction, Cramer made little effort to recruit new employees and retain existing employees, and in fact, failed to hire any professionals between October 2015 and his resignation in May 2016. Kroll has no record that Cramer even extended any offers to potential new employees and in fact, he even *discouraged* potential recruits from pursuing employment at Kroll.

49.     For example, on April 12, 2016, less than a month before Cramer's resignation announcement, a potential recruit—an investigative reporter for a major Chicago newspaper—contacted Cramer to express his interest in joining Kroll, stating: "I'm still very interested in positions with Kroll if they are or become available." Rather than encouraging this individual to interview and/or passing his name along to his Kroll colleagues to pursue the potential candidate, Cramer, who knew he would be leaving in a matter of weeks and notwithstanding the CEO's directive to build the Chicago office, poured cold water on this potential recruit, stating: "Yes,

some movement here and none of it good, as we have lost some valuable people. Not sure what happens next but will keep you posted." In stopping this potential recruitment dead in its tracks, Cramer breached his fiduciary and other obligations to Kroll.

50.    Cramer's primary focus during this period was to increase his compensation at Kroll while looking for a new job with Kroll's competitors, particularly BRG. In fact, Cramer repeatedly threatened to leave Kroll to join a competitor if his demands were not met. For example, in an email dated November 23, 2015, to the global head of Kroll's I&D business, Cramer stated the following:

> I know you are busy ramping-up and touching base with the different regions while events remind us that our daily lives can be altered in a moment. I needed, however, to make some decisions this past weekend with respect to conversations I've been having with other companies. I couldn't keep them hanging as they sought to bring me onboard. Since I had nothing with which to compare their offers, I informed them that I am hitting pause on the process for now and will revisit after the holidays. This is a distraction for me and my team as they wonder if I am staying. That is why I approached [former Kroll CEO] Manny after I rejected two other offers. Let me know when you have time to talk about my Agreement and concerns about Kroll. Thanks.

51.    Cramer resigned from Kroll, effective as of May 13, 2016, which triggered the non-compete period in the 2014 CNPR, such that he could not work for a competitor of Kroll until at least May 13, 2017. Notwithstanding this non-compete period and his other restrictive covenants, Cramer informed Kroll that he planned to join the Chicago office of BRG. On June 28, 2016, BRG issued a press release announcing that Cramer had joined its Chicago office as a Managing Director in its Global Investigations and Strategic Intelligence Practice at BRG.

52.    As noted above, BRG is Kroll's direct competitor in the risk consulting business, with offices in many of the same cities, including in Chicago where Kroll's and BRG's offices are literally two miles apart. According to its website, BRG, like Kroll, provides services including compliance, corporate investigations, cyber security, forensic accounting, and integrity

and compliance monitorships, among others. In contrast to Kroll, BRG has only been in existence since 2010, and upon information and belief, has focused on building its franchise in the I&D space only in the past 15 months through aggressive recruitment of senior professionals from competing firms. In working for BRG in a senior leadership position, Cramer will be engaged in providing the same services that he performed at Kroll in express violation of the 2014 CNPR.

53.     The 2014 CNPR provides that "[i]n the event you violate a restriction in Section 5, then the restricted period for such restriction shall be extended by one day for each day you have violated the restriction up to a maximum extension of twelve (12) months." As Cramer has violated his 2014 CNPR and continues to do so, the twelve (12) month period must be extended accordingly.

54.     In the days and weeks preceding his resignation, and in direct contravention of the 2014 CNPR, Cramer contacted various Kroll clients to advise them of his upcoming move to BRG. For example, Cramer received an e-mail from a partner at a major law firm which is a longstanding client of Kroll's, that indicates that Cramer called to inform him of his move to BRG, and planned to connect with Cramer in the future. After Cramer gave notice of his resignation and stated he was joining BRG, he also emailed Kroll colleagues to announce his departure from Kroll, and asked them to tell his clients he was leaving the Company. Cramer also evidenced an intention to continue reaching out to Kroll clients after his resignation when, in a departure email to his former colleagues, he referred to the clients that he serviced as his personal "friends."

55.     Then, within weeks of Cramer's announcement that he would be joining BRG, in what could not possibly be a coincidence, three (3) Kroll I&D employees in the Chicago office,

all of whom worked closely with Cramer at Kroll over the last five (5) years—a Senior Director (30 matters with Cramer), an Associate Director (35 matters with Cramer), and a Senior Associate (49 matters with Cramer)—announced their resignations to join Cramer at BRG. During the same time frame, BRG also actively recruited the longstanding head of Kroll's Buenos Aires, Argentina office (a Kroll Managing Director with whom Cramer had worked) who announced his resignation from Kroll to join BRG on or about June 23, 2016. That same day, Scott Swimley, BRG's head of recruiting, called the Senior Managing Director and head of Kroll's San Francisco office in an effort to recruit her too. Mr. Swimley used Cramer's name in soliciting this Senior Managing Director and bragged that BRG was "on a roll" having "just decimated the Kroll Chicago office."

56.    Kroll does not know the full extent to which Cramer improperly solicited its clients and may have solicited the four Kroll employees—nor the extent to which other former Kroll employees now at BRG may have been involved—because in an obvious attempt to cover his tracks, on May 2, 2016, the day before he sent his departure email to the firm, Cramer wiped the data from his Company smartphone, which was in flagrant violation of his 2014 CNPR and Company policy, and his fiduciary obligations to Kroll. Therefore, the phone logs and text messages that would otherwise demonstrate with whom, and about what, Cramer had been communicating on a Company-issued device were purposely destroyed. It is almost inconceivable that a former federal prosecutor, who regularly conducts forensic investigations, could have believed it acceptable to delete the data from his Company smartphone, while fully aware that his stated intention to work for Kroll's competitor in contravention of his 2014 CNPR would likely lead to litigation.

57.     As noted above, by deliberately destroying this evidence, Cramer breached his 2014 CNPR which required Cramer to "preserve all Company Records," to "return all Confidential Information, Company Records, and other Company property upon termination of employment," and "to permit the Company to inspect any materials to be removed from the Company's offices when [his] employment terminates." The wiping of his phone also violated the Company's Code of Conduct, which is incorporated by reference in the 2014 CNPR, and regarding which Cramer received training and signed an acknowledgement of his obligations. It required him to "[a]void conflicts of interest," "[p]rotect the Company's corporate assets," and protect company information from "inappropriate disclosure to clients, competitors . . . and other third parties."

58.     Cramer's actions also violated Kroll's Information Security Policy, which requires that "[u]pon termination of employment . . . [i]ndividuals are to return all previously issued physical and electronic Company assets in their possession to the Company" and that "[d]isposal of sensitive items is to be logged in order to maintain an audit trail," and the Company's Acceptable Use of Information Technology Policy which explicitly states "the Company's right to retrieve and read any message or Information on Company-provided wireless devices (e.g., text messages) " and that "[a]ll information contained in email and other messages to and from Company's systems could be subject to legal discovery and other review."

59.     On May 5, 2016, two (2) days after Cramer's resignation announcement, Kroll's Vice President and Deputy General Counsel sent Cramer a letter reminding him of his post-employment obligations to Kroll, including the 2014 CNPR Restrictive Covenants, and advising Cramer that if he violated those restrictive covenants, Kroll would take necessary legal action to protect itself. Cramer ignored the letter. Having received no response, on May 13, 2016, Kroll's

outside counsel sent BRG's General Counsel a letter putting BRG on formal notice of Cramer's post-employment obligations and Kroll's intention to pursue legal action should Cramer fail to comply with the terms of his 2014 CNPR.

60.     On May 23, 2016, Kroll's outside counsel received a response from Alston & Bird, outside counsel to Cramer and BRG.  In that letter, Cramer stated, *inter alia*, that he planned to commence employment at BRG, notwithstanding the restrictions in his 2014 CNPR. Moreover, Cramer further alleged, *inter alia*, the following:

- He is free to solicit Kroll's clients because he "used his own goodwill to develop his own clients";

- "[t]he business [he] generated was almost exclusively derived from his own contacts and relationships";

- He "denies that he was ever provided confidential or trade secret information about Kroll itself," and "disputes[s] that rates charged to clients are generally confidential or unique";

- He admitted that he wiped his Company phone, but did so because it "included family photographs, texts with his wife and children, music, and personal passwords and credit card numbers"; and

- He maintains that Kroll "[has] no enforceable interest."

61.     Thus, Cramer stated unequivocally that he intends to disregard his contractual obligations to Kroll and that he believes them to be wholly unenforceable. *See id.*  Cramer and BRG's utter disregard for the validity of the 2014 Restrictive Covenants is particularly surprising given that less than a year ago, BRG's own employee, former Kroll executive David A. Holley, who like Cramer was a Senior Managing Director at Kroll, expressly acknowledged the validity of **the exact same restrictive covenants** that are contained in Cramer's 2014 CNPR, in resolving a dispute over BRG's hiring of Mr. Holley.  Specifically, Mr. Holley agreed and acknowledged that **"the terms and time period[s] agreed to by [employee] in his [CNPR] remain valid and fully enforceable by Kroll . . . including but not limited to, [employee's]**

**non-disclosure obligations in Section 3 of his [CNPR] and his non-solicitation and non-interference obligations in Sections 5(a)-(b) of the [CNPR]."** *See* Exhibit C (Holley Settlement Agreement, dated November 12, 2015) (emphasis added). Holley further represented and warranted that he "was instructed by BRG not to solicit or attempt to solicit, induce, encourage or entice any Kroll Employees to leave their employment or to join BRG." *Id.*

62.     On June 15, 2016, Kroll's counsel requested an in-person meeting with counsel for BRG and Cramer to provide Cramer with a final opportunity to abide by his restrictive covenant obligations in order to avoid litigation. Because BRG's general counsel and lead counsel were allegedly unavailable due to an extended vacation, the parties met on July 7, 2016, promptly upon their return. Despite Kroll's express request that Cramer be present for the meeting, he did not attend—only BRG's general counsel and BRG/Cramer's outside counsel appeared. At that meeting, they clearly stated that Cramer would not cease his employment with BRG and did not dispute Kroll's counsel's statement that Cramer was fully indemnified by BRG, and therefore would be paid even if he were to cease employment with BRG for twelve (12) months.

63.     Under these circumstances, Kroll is in imminent danger of suffering further irreparable harm of losing clients, employees, and confidential and proprietary information and trade secrets—precisely the harm that Kroll contracted to avoid by conditioning Cramer's continued employment and participation in the Company's LTIP program on adherence to the 2014 CNPR Restrictive Covenants. As referenced above, BRG has boasted that it "decimated Kroll's Chicago office" and has already used Cramer's name to solicit Kroll employees in other offices.

## COUNT ONE
**Breach of Contract**

64.     Kroll incorporates the preceding allegations of this Complaint as if fully set forth

herein.

65.     The 2014 CNPR is a valid, enforceable contract binding on Cramer, and as a party

to that contract, Kroll is entitled to sue for its breach.  Kroll has performed all of its obligations

under the 2014 CNPR.  Cramer violated and will continue to violate the 2014 CNPR by, among

other things:

- Working for BRG, a direct competitor of Kroll, during the 12-month period following his resignation from Kroll;

- Interfering with Kroll's business relationships with its customers for which Cramer provided services within the past year or regarding which Cramer received confidential information by soliciting or communicating with them to stop or reduce business with Kroll and to seek competing services from BRG;

- Upon information and belief, interfering with Kroll's relationships with its employees, by soliciting or communicating with its employees to induce or encourage them to leave employment with Kroll and by helping BRG hire employees away from Kroll; and

- Disclosing Kroll's Confidential Information as defined in the 2014 CNPR.

66.     As a direct and proximate result of those breaches, Kroll has suffered, and will

continue to suffer, extensive, irreparable injury, loss of goodwill, harm to its business, and other

injury and damages for which there is no adequate remedy at law.  As a direct and proximate

result of Cramer's breaches, Kroll has already suffered and will continue to suffer additional

damages, which continue to accrue in the form of attorneys' fees and costs related to this

litigation, and lost business in an amount to be proven at trial.

## COUNT TWO
### Breach of Fiduciary Duty

67.     Kroll incorporates the preceding allegations of this Complaint as if fully set forth herein.

68.     As an employee and one the highest-ranking executives of Kroll, Cramer owed a fiduciary duty to Kroll.

69.     By virtue of his employment, Cramer had access to confidential and proprietary information and trade secrets.

70.     By reason of the foregoing, and his acknowledgment of confidentiality, non-disclosure, and non-solicitation obligations, Cramer stood in a fiduciary relationship with Kroll.

71.     Upon information and belief, Cramer has breached the fiduciary duties and duties of loyalty owed to Kroll by, among other things, (1) refusing to hire new employees when specifically instructed to do so, and in fact discouraging potential recruits from joining Kroll; (2) soliciting Kroll clients to leave Kroll while Cramer was still a Kroll employee; (3) violating Company policies regarding maintaining and not destroying Company property; (4) stating that he will not adhere to his obligations to maintain Kroll's confidential information, as defined in the 2014 CNPR, as confidential; and (5) upon information and belief, soliciting Kroll employees and/or otherwise interfering with their employment relationship at Kroll, to join BRG.

72.     As a direct and proximate result of the foregoing conduct, Kroll has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  As a direct and proximate result of Cramer's breaches, Kroll has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## COUNT THREE
### Misappropriation of Trade Secrets under the
### Illinois Trade Secret Act

73.     Kroll incorporates the preceding allegations of this Complaint as if fully set forth herein.

74.     Over many years, Kroll has developed and run an extremely successful risk consulting business that highly depends on maintaining the secrecy of its and its clients' confidential and proprietary information.

75.     As a result of Cramer's employment with Kroll, Cramer came into possession of highly confidential and proprietary trade secret information having independent economic value and not generally known or readily available to Kroll's competitors. Kroll expended substantial time, energy, money, and ingenuity in compiling this information based on its own efforts and communications with clients, prospective clients, and others.

76.     Kroll has taken and continues to take extensive measures to ensure that the confidential and proprietary information remains secret by, among other things, disclosing it only to those individuals who need the information to perform their duties, requiring all employees to sign nondisclosure agreements, entering into confidentiality agreements with clients on their matters, and implementing internal and external security measures, including firewalls, to limit access to and disclosure of confidential information.

77.     As a condition of his employment with Kroll, Cramer was at all times during his employment subject to a nondisclosure agreement. Cramer further entered into the 2014 CNPR, in which he agreed to maintain the confidence of Kroll confidential and proprietary information.

78.     Kroll's confidential information constitutes protectable trade secrets.

79.     In the May 23, 2016 letter from Alston & Bird, outside counsel to both BRG and Cramer, Cramer stated, *inter alia*, that he "denies that he was ever provided confidential or trade secret information about Kroll itself," and "disputes[s] that rates charged to clients are generally confidential or unique."

80.     On information and belief, Cramer has misappropriated the trade secrets embodied in Kroll's confidential information in a willful manner and with the deliberate intent to injure Kroll's business and improve BRG's business for its and Cramer's own financial gain.

81.     As a proximate result of the misappropriation of Kroll's trade secrets, Kroll has suffered, and will continue to suffer, actual damages, and Cramer will be unjustly enriched in sums not yet ascertained.

82.     Kroll is entitled to recover its reasonable attorneys' fees as a result of Cramer's willful and malicious appropriation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kroll Associates, Inc. prays for the following relief:

1. An injunction enjoining Cramer's continued employment at BRG until at least May 13, 2017 or twelve (12) months from the date of his last violation of his 2014 CNPR Restrictive Covenants.

2. An injunction barring Cramer from disclosing or directly or indirectly using, or allowing to be used, any of Plaintiff's confidential information or trade secrets.

3. An injunction barring Cramer from directly or indirectly soliciting or interfering with Kroll's employees until at least May 13, 2017 or twelve (12) months from the date of his last violation of his 2014 CNPR Restrictive Covenants.

4. An injunction barring Cramer from directly or indirectly soliciting or interfering with Kroll's clients until at least May 13, 2017 or twelve (12) months from the date of his last violation of his 2014 CNPR Restrictive Covenants.

WHEREFORE, Plaintiff Kroll Associates, Inc. further prays for an award of compensatory, disgorgement, and punitive damages against Defendant, as well as an award of attorneys' fees and expenses.

WHEREFORE, Plaintiff further prays for any such other and further relief the Court may deem just and proper.

Dated:  July 12, 2016

/s/ _Brandon Elledge_ /with permission JMF

Brandon H. Elledge (VSB #45349)
Timothy J. Taylor (VSB #84529)
HOLLAND & KNIGHT LLP
1600 Tysons Boulevard, Suite 700
Tysons Corner, Virginia 22102
703-720-8600 (Tel.)
703-720-8610 (Fax)
brandon.elledge@hklaw.com
timothy.taylor@hklaw.com

-and-

WEIL, GOTSHAL & MANGES LLP
Gary D. Friedman (*pro hac vice* pending)
767 Fifth Avenue
New York, New York  10153
Tel:(212) 310-8000
Fax: (212) 310-8007
Email: gary.friedman@weil.com

*Attorneys for Plaintiff Kroll Associates, Inc.*

## VERIFICATION

The foregoing pleading and allegations therein are true to the best of my knowledge, information, and belief.  Although I do not have personal knowledge of all of the facts contained in this pleading, with respect to such facts I have been informed that they are true and base my belief as to the accuracy of this pleading on such information.

Dated: July 11, 2016

Kroll Associates, Inc.

Daniel E. Karson

Chairman of Investigations and
Disputes Division for North and
South America and New York
Head of Office of Kroll
Associates, Inc.

Sworn to me on this 11th day of July, 2016

7-11-16

Kristen Anne D'Allegro
Notary Public, State of New York
No. 01DA6309342
Qualified in New York County
Commission Expires August 11, 2018