# EXHIBIT A

### KROLL INC.

December 19, 2014

To: Jeffrey Cramer

<u>Participation Notice</u>

Dear Jeffrey:

      Kroll Inc. (the "**Company**") is pleased to evidence and confirm its grant to you of 400,000 Units, each with a Base Price of One Dollar ($1.00), pursuant to the Kroll Inc. Long-Term Incentive Plan (the "**Plan**"). The terms defined in the Plan have the same meanings in this Participation Notice (the "**Notice**"). This Notice is governed by the laws of the State of New York. The date as of which the Units will begin vesting is December 19, 2014 (the "**Vesting Commencement Date**"). We encourage you to review the enclosed Plan document, as this Notice and the Units evidenced by this Notice are subject to and are subordinate to the terms and conditions set forth in the Plan. Additionally, please see Annex A to this Notice for the hypothetical value of your Units at various levels of projected LTM EBITDA at the time of a Triggering Event (as all terms are defined in the Plan).[1] As further set forth in the Plan, if your employment terminates (whether initiated by you or by the Company) prior to the date on which the Units are fully vested, you will forfeit all or a portion of your Units.

      As a condition to the Company's grant to you of Units under the Plan, you hereby agree to the cancellation of any and all rights you have under the ▮▮▮ vested and unvested options to purchase common stock of Altegrity Holding Corp. currently held by you. As an additional condition, if any agreement containing covenants relating to confidentiality, non-competition and non-solicitation is attached to this Notice, you agree to execute and return to the Company the attached agreement (if applicable).

      Congratulations on your participation in the Plan. We appreciate your past efforts and look forward to your continued outstanding performance.

[signature page follows]

---

[1] Please note that the calculations included in Annex A to this Notice are being provided for illustrative purposes only. There can be no assurance or guarantee (1) that the Company will achieve the growth necessary to achieve the figures or (2) as to the method or timing of future liquidity events. The illustrative returns are based on both economic and non-economic assumptions (including, for example, that the employee's employment will continue through the future liquidity event). Actual Company results may differ significantly from the results necessary to achieve the figures illustrated in the calculations.

**Kroll Inc.**

By: _____

Name: Emanuele Conti
Title:  CEO

Agreed and Accepted:

_____
Jeffrey Cramer

_December 30, 2014_
Date:

**Annex A**
**Value of Award Units Based on LTM EBITDA at Triggering Event**

| | Illustrative LTM EBITDA at Exit | | | | | | |
|---|---|---|---|---|---|---|---|
| | ████ | ████ | ████ | ████ | ████ | ████ | ████ |
| Your # of Units | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 |
| Value Per Unit Based on LTM EBITDA | $0.00 | $0.20 | $1.00 | $1.75 | $2.50 | $3.00 | $3.25 |
| Potential Value of Your Award Units at Exit | $0 | $80,000 | $400,000 | $700,000 | $1,000,000 | $1,200,000 | $1,300,000 |

Disclaimer: The foregoing calculations are being provided for illustrative purposes only. There can be no assurance or guarantee (1) that the Company will achieve the growth necessary to achieve these figures or (2) as to the method or timing of future liquidity events. These illustrative returns are based on both economic and non-economic assumptions (including, for example, that the employee's employment will continue through the future liquidity event). Actual Company results may differ significantly from the results necessary to achieve the figures illustrated in these calculations.

## CONFIDENTIALITY, NON-SOLICITATION AND PROPRIETARY RIGHTS AGREEMENT FOR US EMPLOYEES

This Confidentiality, Non-Solicitation, and Proprietary Rights Agreement ("CNPR Agreement") is entered into between Altegrity, Inc. (together with its divisions and subsidiaries, parents, related entities, and affiliates and its and their predecessors, successors and assigns "Company") and the individual signing this CNPR Agreement ("Employee" or "You/you").

The Company is placing you in a position of special trust and confidence. The Company's willingness to employ you or to continue to employ you is based, in part, on your promises in this Agreement. In further reliance on these promises, the Company agrees to do one or more of the following: (a) provide you with items of Confidential Information, including trade secrets, and updates thereto; (b) authorize you to communicate and develop goodwill with Company customers, and/or (c) provide you with specialized training related to the Company's business. You agree that this consideration has material value and benefit and that the Company would not be providing it to you in the absence of your promises.

### 1.    Position of Trust and Confidence; Duty of Loyalty.

   a.    While employed with the Company, you will dedicate your full working time and efforts to Company business and avoid conflicts of interest and activities that are detrimental to the Company. You will comply with all Company policies, including the Company's Code of Conduct, which is incorporated herein by reference, and promptly inform the Company of any business opportunities that are related to the Company's business. These duties supplement and do not diminish your common law duties to the Company.

   b.    The Company is only authorizing you to access and use Company computer systems and email to pursue matters that are consistent with the Company's interests. Access or use of such systems to pursue personal business interests, to compete, or to otherwise knowingly undermine the Company's interests (for example, by destroying files) is strictly prohibited and outside the scope of your authorized use of Company systems.

### 2.    Definitions.

"**Confidential Information**" means information or a compilation of information, in any form (tangible or intangible), related to the Company's that has not appropriately been made public and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use. Confidential Information includes, but is not limited to, the Company's: business plans and analysis; financial information; pricing information; training information and programs; customer and prospective customer lists and contact information; customer buying histories, requirements, preferences, and specifications; vendor information and vendor history; referral source information; marketing plans, strategies and promotions; research and development data; buying practices; supplier information; employee data, organizational information, internal business methods and techniques; technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and information about the business affairs of third parties (including, but not limited to, customers, vendors and suppliers) that such third parties provide to the Company in confidence. Information that is intentionally disclosed or authorized for disclosure to the general public by Company is not considered Confidential Information. You acknowledge that items of Confidential Information are Company assets and have economic value because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of the Company, and thus, should be treated as trade secrets. Nothing herein shall be construed as limiting or impeding an employee covered by the National Labor Relations Act (the "Act") from exercising his or her rights under Section 7 of the Act by, for example, disclosing terms and conditions information.

1

**"Company Inventions and Intellectual Property ("CIIP")"** means all intellectual property: (a) that relates to Company's business, or to any actual or demonstrably anticipated Company research, future work, or projects, whether conceived or developed alone or with others, and whether conceived or developed during regular work hours; or (b) that results from your work performed for Company or performed on Company time or using Company resources.

**"Company Record"** means any document or file, whether hard copy or electronic, concerning the Company's business and affairs.

**"Competing Activities"** are any activities or services undertaken on behalf of a person or entity engaged in providing a Competing Product or Service that are the same or similar in function or purpose to those you performed in the Look Back Period. Competing Activities do not include: (i) activities on behalf of an independently operated business unit of a larger business that has division(s) that provide a Competing Product or Service so long as the business unit to whom you are providing services does not provide a Competing Product or Service; or (ii) a passive and non-controlling ownership interest in less than 2% of the stock in a publicly traded company.

**"Competing Product or Service"** is a product and/or service that is the same or similar in function or purpose to a Company product and/or service, such that it would replace or compete with: a product and/or service Company provides to its customers; or a product or service that is under development or planning by Company but not yet provided to customers and regarding which you were provided Confidential Information. Competing Products or Services do not include a product or service of the Company if the Company no longer provides such product or service to its customers at the relevant time of enforcement.

**"Covered Customer"** is a Company customer as to which you received Confidential Information or had business dealings in the Look Back Period, but excludes any entity who ceased being a customer at least six (6) months prior to your termination (due to no fault of you).

**"Look Back Period"** means the one (1) year prior to the end of your employment with Company.

**"Restricted Area"** is the United States. If you are an executive with Confidential Information pertaining to the Company's international operations, the Restricted Area also includes Europe, Latin America, and Asia and any additional countries and territories where the Company markets its products and services during the Look Back Period, to the extent permitted by law. If your primary responsibilities are sales or the supervision of sales activities within a defined territory, the Restricted Area is such territory. This is a reasonable geographic area because you are expected to help Company provide its products and services and create, receive and analyze Confidential Information pertaining to such products and services throughout the Restricted Area.

## 3.    Nondisclosure.

a.  You agree not to engage in any unauthorized use or disclosure of Confidential Information. You agree to preserve all Company Records and not to use any Company Records in any way, directly or indirectly, to harm the Company. You will not use Confidential Information or Company Records for any purpose without the prior written authorization of a Company officer, except that you may use Confidential Information and Company Records to perform your duties. The restrictions on disclosure of Confidential Information will only apply for three (3) years after the end of your employment where information that does not qualify as a trade secret is concerned; however, the restrictions will continue apply to trade secret information for as long as the information at issue remains qualified as a trade secret.

2

**b.** Your use of Confidential Information and Company Records shall cease immediately upon the termination of your employment. You will return all Confidential Information, Company Records, and other Company property to Company upon termination of employment (or earlier if so requested), and will not retain any such material or information except where expressly authorized in writing. You will permit the Company to inspect any materials to be removed from the Company's offices when your employment terminates. You understand that you have no reasonable expectation of privacy with respect to materials and belongings that you bring onto Company premises.

**c.** This Agreement does not require you to withhold information in violation of any applicable state or federal law nor does it prohibit the reporting of information where such reporting is protected by law. You agree that if disclosure of Confidential Information or a Company Record is compelled by law (such as by a subpoena), you will give the Company as much written notice (to the Company's General Counsel) as possible, will refrain from use or disclosure for as long as the law allows, and will cooperate with the Company to protect such information, including taking every reasonable step to protect against unnecessary disclosure.

**4.** **Company Inventions and Intellectual Property ("CIIP").**

**a.** All CIIP shall be the Company's exclusive property unless otherwise agreed by both parties in writing. While employed, and as necessary thereafter, you will assist Company to obtain patents or copyrights on all such CIIP that Company seeks to protect, and will execute all documents and do everything necessary to obtain for Company copyrights, patents, licenses, and other rights and interests that would be necessary to secure for the Company the complete benefit of CIIP. You hereby assign to Company or its designee all right, title, and interest to all CIIP that you have acquired or do acquire in the future, during employment or association with the Company. To the extent state law where you reside requires it, *you are notified that no provision in this Agreement requires you to assign any of your rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on your own time, unless (a) the invention relates at the time of conception or reduction to practice of the invention, (i) to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work you performed for the Company.*

**b.** If you have any inventions or improvements relevant to your work for the Company which were made, conceived, or first reduced to practice by you (alone or with others) prior to becoming employed by the Company, in order to remove such inventions or improvements from the assignment provisions in Section 4(a) above, you are instructed to identify any and all such inventions or improvements on Appendix B attached hereto. If you have no such inventions or improvements, you are asked to check the box under your signature. If you disclose, use or incorporate any of the retained inventions specified in Appendix B into any product, service or other work product of the Company without the prior written agreement of the Company, you will thereby grant to the Company a perpetual, non-exclusive, royalty-free, fully paid up, irrevocable, worldwide license, including the right to sublicense others, to exercise all intellectual property rights and rights of publicity and/or privacy in such retained inventions which were the subject of such disclosure, use or incorporation without the prior written agreement with the Company.

**5.** **Protective Covenants.** You agree that the following covenants are reasonable and necessary to protect the Company's legitimate business interests, including the protection of the Company's trade secrets, not against the public interest, and do not impinge on your ability to earn a living. You also agree to advise future employers of this Agreement's restrictions before accepting employment. The post-employment restrictions provided for in this Agreement shall survive the termination of your employment, regardless of the cause of termination. During the twelve (12) month period immediately following the end of your employment with Company, you will not:

3

a) interfere with the Company's relationships with its employees, by: (i) soliciting or communicating with an employee to induce or encourage him or her to leave Company's employ (regardless of who first initiates the communication); (ii) otherwise helping any person or entity hire an employee away from Company; or (iii) hiring an employee to work elsewhere.

b) interfere with Company's business relationships with a Covered Customer, by soliciting or communicating (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: (i) stop or reduce doing business with Company, or (ii) to buy a Competing Product or Service. The parties agree this restriction is inherently reasonable because it is limited to the locations where the Covered Customer does business; or

c) participate in, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) Competing Activities in the Restricted Area.

**6.** **Remedies.** In the event of a breach or threatened breach of this Agreement, the prevailing party may be entitled to: (a) an order of specific performance or declaratory relief; (b) injunctive relief; (c) damages; (d) attorney's fees and costs incurred in obtaining relief; and (e) any other legal or equitable relief or remedy allowed by law. If a bond is required to be posted by the Company to secure injunctive relief, the parties agree that One Thousand Dollars ($1,000.00) is the amount for the bond that needs to be posted by the Company.

**7.** **General.**

a. The parties intend that if any provision of the Agreement is determined by a court of competent jurisdiction to be void, illegal or unenforceable, in whole or in part, all other provisions will remain in full force and effect, as if the void, illegal, or unenforceable provision is not part of the Agreement. Further, where allowed by applicable law, if any portion of this Agreement is determined by a court of competent jurisdiction to be overly broad or otherwise unenforceable, the parties consent to such court modifying or reducing such provision to the degree necessary to protect the Company's legitimate interests.

b. If either party waives his, her, or its right to pursue a claim for the other's breach of any provision of the Agreement, the waiver will not extinguish that party's right to pursue a claim for a subsequent breach.

c. Except where otherwise expressly indicated, the Agreement contains the parties' entire agreement, and supersedes any prior agreement or understanding between the parties, whether written or oral, concerning the matters covered in it.

d. The Agreement may not be waived, modified, altered or amended except by written agreement of all parties or by court order.

e. This Agreement may be assigned by the Company without the need for further written consent by you to any parent, subsidiary, affiliated business, related entity or any successor to the Company, including a purchaser of all or substantially all of the Company's assets or stock, and such assignment shall be deemed to have been made upon the closing of any such purchase or acquisition without the need for any separate document. In which case, the assignee shall step into the Company's shoes and all references to the Company in this Agreement shall apply to such assignee.

f. You understand and acknowledge that this Agreement is applicable even if you change positions or roles within the Company. The terms of this Agreement shall continue to apply with full force and effect in the event that you: (a) are promoted, demoted, transferred, assigned or otherwise assume one or more positions or functions other than, or in addition to, your position or functions as of the date you originally

4

signed this Agreement, regardless of changes in job title, duties, management or compensation; or (b) you are transferred or assigned to, or otherwise work for, any affiliate, subsidiary or other division or business unit of the Company.

g.   The Company may notify others of this Agreement and provide an opinion about its applicability. Although you may disagree with the Company, you acknowledge the Company's legitimate business interest in expressing its opinion and consent to it doing so.  Such conduct shall not form the basis of any claim by you, regardless of the ultimate enforceability of this Agreement.

h.   The laws of the state where you regularly and primarily work for the Company shall apply.  You consent to the personal jurisdiction of the state and federal courts located in or having jurisdiction over Fairfax County, Virginia, and waive any rights to the contrary.  The parties agree that the exclusive venue and forum for any legal action arising from this Agreement is a court of competent jurisdiction in Virginia.

i.   Nothing herein modifies the at-will nature of the parties' employment relationship, unless otherwise expressly provided in a separate writing signed by you and an authorized representative of the Company.

j.   In the event you violate a restriction in Section 5, then the restricted period for such restriction shall be extended by one day for each day you have violated the restriction up to a maximum extension of twelve (12) months.

k.   The existence of a cause of action by you against the Company shall not constitute a defense to enforcement of the restrictions on you.

l.   The parties hereby waive their right to jury trial on any legal dispute arising from or relating to this Agreement, and consent to the submission of all issues of fact and law arising from this Agreement to the judge of a court of competent jurisdiction.

m.   The terms of this Agreement may be modified, depending on where you are located, as set forth in Appendix A, which is incorporated into this Agreement for all purposes.

n.   All references to termination or end of employment shall mean both voluntary and involuntary termination.

8.   **No Conflicting Obligations.**  You represent that you are not subject to any restrictions that purport to preclude or limit your ability to perform services for Company or that any such restrictions have been previously disclosed to Company.  You agree to disclose to Company the existence of any agreements with prior employers (while at the same time being cognizant of and complying with any confidentiality obligations pertaining to such agreements).  The Company expects that you will not bring a former employer's trade secrets or confidential information, if any, with you to Company and that you will not use or disclose a prior employer's trade secrets or confidential information, if any.

THE COMPANY:

FTDI Inc.

[fill in name of employing entity]
By: _____
Title: SVP, Head of HR

EMPLOYEE:

Name: _____
Date: December 30 2014

☑ Please check this box if you have no Retained Inventions to disclose pursuant to Section 4(b).

## APPENDIX A

These modifications shall apply if you reside in an identified state and are subject to its laws and shall continue to apply for as long as you reside in such state.

**A.**     **Arizona.**  The restrictions in Section 5(b) will only apply within the Restricted Area.

**B.**     **California and North Dakota.**  (1) the provisions of Section 5(c) shall not apply; (2) the jury trial waiver in Section 7(l) shall not apply (this modification is for California only); (3) the provisions of Section 5(a) shall be rewritten "You agree that for a period of twelve (12) months following the end of your employment with Company, you will not solicit an employee of the Company to leave Company's employment;" and (4) the provisions of Section 5(b) shall be rewritten as follows:

use the Company's trade secrets to interfere with the relationship between the Company and a customer. It shall be considered a prohibited act of interference for you to use the Company's trade secrets to participate in soliciting, encouraging, or inducing a customer (a) to obtain a Competing Product or Service elsewhere, or (b) to stop or reduce doing business with the Company, except where such conduct is expressly authorized in writing by an authorized officer of the Company. The parties stipulate that this restriction is inherently limited to a reasonable geography or geographic substitute because it is limited to the place or location where the customer is located at the time.

**C.**     **Wisconsin.**  (1) A "Competing Product or Service" is further limited to those products or services of the Company that you either (i) received Confidential Information and/or (ii) marketed or sold on behalf of the Company, during the Look Back Period; and (2) the tolling language in Section 8(h) shall not apply.

**D.**     **Louisiana.**  The restrictions in Sections 5(b) and 5(c) will be limited within Louisiana to the Parishes in which you assist Company in providing its products and services, as are indicated by being circled below; provided, however, that nothing in Agreement may be construed to prohibit the enforcement of Sections 5(b) and 5(c) in accordance with their terms in states outside of Louisiana.

St. Tammany, St. Bernard, Plaquemines, Jefferson, Iberville, E. Baton Rouge, W. Baton Rouge, St. Charles, St. John the Baptist, Washington, Orleans, Ascension, Livingston, Pointe Coupee, St. Helena, E. Feliciana, W. Feliciana

**E.**     **Georgia.**  The jury trial waiver in Section 7(l) shall not apply.

**F.**     **Nebraska.**  The definition of **"Covered Customer"** is revised to mean "a Company customer with which you had business dealings in the Look Back Period, but excludes any entity who ceased being a customer at least six (6) months prior to your termination (due to no fault of you)."

6

## **APPENDIX B**

### **RETAINED INVENTIONS**

The following is a complete list of all inventions or improvements relevant to the subject matter of my employment (which includes my acting as a consultant or part-time employee) by the Company which have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

_____

_____

_____

_____

_____


_____

Employee


_____

Date

Name of Recipient: Jeffrey Cramer

Number of Units: 400,000

Base Price per Unit: One Dollar ($1.00)

Vesting Commencement Date: December 19, 2014

Kroll Inc. Long-Term Incentive Plan

*Frequently Asked Questions*

You are receiving these frequently asked questions because you have been selected to receive an award of Units from Kroll Inc. (the "**Company**") under the Company's newly-adopted Long-Term Incentive Plan (the "**Plan**"), which has been established by the Company for selected key employees of the Company and its affiliates.

**These frequently asked questions are intended to provide you with a summary of some of the material terms of the Unit award. To the extent that there is any discrepancy between these frequently asked questions and the Plan document and related agreements, the Plan document and related agreements will control.**

*       *       *

GENERAL

*What is the Plan?*

The Company has established the Kroll Inc. Long-Term Incentive Plan to attract and retain selected employees of the Company and its affiliates whose services relate to the Kroll operating segment of Altegrity, Inc. (the "**Business**"). The Plan is designed to provide for awards of Units which represent the right to a future payment at the time of the sale of the Business or initial public offering covering the Business ("**IPO**"), according to a prescribed formula, and subject to applicable vesting criteria.

A copy of the Plan and the related participation agreement that you must sign to accept your Unit award and participate in the Plan is being provided to you along with this summary.

THE UNIT AWARD

*What have I been Granted under the Plan?*

Your award consists of a number of units (each, a "**Unit**") each of which has a specified base price (the "**Base Price**") listed at the top of the first page of this summary. Your Unit award is also set forth in your participation agreement that accompanies this summary. The amount, if any, paid to you under the Plan may be more or less than the aggregate Base Price applicable to your Units and will be based on an adjustment to the Base Price made at the time of the sale of the Business or an IPO. This adjustment will be based on a performance factor determined by reference to the EBITDA of the Business at that time.

*Are there any Conditions to my Unit Award?*

Yes.  As a condition to the grant of your Unit award:

1) If you currently hold vested or unvested options to purchase common stock of Altegrity Holding Corp. ("**Altegrity Options**") and/or unvested restricted stock units for common stock of Altegrity Holding Corp. ("**Restricted Stock Units**"), then by accepting your Unit award you will be agreeing to the immediate cancellation of all of your Altegrity Options and/or unvested Restricted Stock Units without payment or compensation (an "**Option and/or RSU Surrender**").  Other than the grant of the Unit award, you will not receive any additional consideration for the Option or RSU Surrender.

2) If requested by the Company, you must agree to the form of restrictive covenant agreement that is customarily used by the Company or any of its affiliates with its employees.  The restrictive covenants will apply to you whether or not you ultimately receive a payment in respect of your Unit award.  If applicable, a copy of this form of restrictive covenant agreement accompanies your participation agreement.

*Why am I being Offered the Unit Award?*

The Board of Directors of Altegrity, Inc. (the "**Board**") and our senior management believe that a select group of our key employees should be given the opportunity to receive Unit awards under the Plan so that they may share in the Company's fiscal growth in the event of a sale of the Business or IPO.

VESTING OF THE UNITS; EFFECT OF TERMINATION OF EMPLOYMENT

*When will the Units "Vest"?*

As a general rule, as long as you continue to be employed with the Company and its affiliates, your Units will vest 25% per year over the next four (4) years. The first annual vesting date will be the first anniversary of the date listed as the "Vesting Commencement Date" on the cover page of these frequently asked questions, and each subsequent annual vesting date will be on the anniversary of that date.

*What does "Vesting" Mean?*

Vesting under the Plan is a concept that is only relevant if your employment terminates before a sale of the Business or an IPO. If your employment terminates before the sale of the Business or an IPO (whether the termination is initiated by you or by the Company), you will retain only the portion of your Units that is vested at the time that your employment terminates, and you will forfeit the unvested portion of your Units. The one exception to this rule is that, if your employment is terminated by the Company for "cause," you will forfeit your *entire* Unit award, whether vested or unvested, without any payment to you. The term "cause" is defined in the Plan and generally covers acts by you that may be damaging to the Company and its affiliates.

If you are employed with the Company and its affiliates at the time of the sale of the Business or an IPO, you will be entitled to payment on 100% of your Units regardless of whether the Unit award has become fully vested based on the schedule above.

*What will happen to the Unit Award if there is a sale of the Business or an IPO?*

If there is a sale of the Business or an IPO, then, with respect to your vested Units, the Base Price of $1.00 will be adjusted to the new figure that corresponds to the EBITDA of the Business for the twelve-month period preceding the date of the sale of the Business or IPO (referred to in the Plan as the "**LTM EBITDA**"). You will be entitled to a lump sum cash payment for each of your vested Units equal to the Base Price as adjusted. (Again, if you remain employed by the Company at the time of the event, all of your Units will be vested.) If the adjusted Base Price is greater than $0.20 and less than $3.25 and falls between two of the dollar figures listed in the table, the adjusted Base Price will be determined by linear interpolation. If the LTM EBITDA is above the highest dollar amount in the table, the Board will decide at the time whether to increase the Base Price above $3.25.

## EBITDA Table

| LTM EBITDA | Adjusted Base Price |
|---|---|
| | $0 |
| ███ | $0.20 |
| | $1.00 |
| | $1.75 |
| | $2.50 |
| | $3.00 |
| | $3.25 |

As an illustration, if (1) the Company undergoes a sale of the Business or an IPO, (2) the LTM EBITDA at that time is ███████, (3) you have been granted 100,000 Units, and (4) you are 100% vested in your Units, your Base Price will be adjusted to $2.75, and you will be paid $2.75 per vested Unit, or $275,000 in the aggregate. If your employment had previously terminated (other than for cause) at a time when you were 75% vested in your Units, your aggregate payment will be $206,250. This amount is subject to withholding for applicable income and employment taxes.

Note that the Company will make only one payment in respect of your Units following the first to occur of a sale of the Business and an IPO. This means that if an IPO occurs and is followed by a sale of the Business, payment in respect of your Units will be made solely following the IPO, and not again following the sale of the Business. In addition, for any payments to be made under the Plan, a sale of the Business or an IPO must occur before December 31, 2019.

"**EBITDA**" is defined in the Plan, and will be subject to adjustment, in the discretion of the Board, in the event of certain extraordinary corporate events (e.g., material acquisitions by the Company).

*What will constitute a sale of the Business or an IPO?*

A sale of the Business will have occurred in the event that a third party purchaser or group of purchasers (excluding investment funds affiliated with Providence Equity Partners, L.L.C. ("**Providence Equity**") and creditors of the Company, and also excluding Altegrity, Inc. and its affiliates) has acquired all or substantially all of the assets that comprise the Business in a transaction (e.g., a sale, merger, transfer or other disposition) that is:

- an acquisition of all or substantially all of the assets of the Company from the Company;

- an acquisition of all or substantially all of the equity securities of the Company from the persons that own these equity securities;

- an acquisition of all or substantially all of the equity securities of Altegrity, Inc. from Altegrity Holding Corp.; or

- an acquisition of all or substantially all of the securities of Altegrity Holding Corp. from the investment funds affiliated with Providence Equity.

For these purposes, an original issuance of equity securities will not give rise to a sale of the Business. While this definition is complicated, its purpose is to cover a "true" disposition of the Business to a third party and not to cover other capital-raising or restructuring transactions.

An IPO will have occurred if, pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission that covers the Business, equity securities relating to the Business will be traded on the New York Stock Exchange, the American Stock Exchange or the National Association of Securities Dealers Automated Quotation System or any comparable non-U.S. exchange or system.

*What will happen if there is a sale of a division of the Company prior to a sale of the Business or an IPO?*

If there is a sale or other disposition of a reasonably identifiable business unit of the Company, prior to a sale of the Business or an IPO, the LTM EBITDA for that business unit at the time of sale or disposition will be added to the LTM EBITDA of the Business at the time of the sale of the Business or IPO. If the business unit is sold or disposed of at an EBITDA multiple that is higher than the expected EBITDA multiple established by the Company in connection with such sale or disposition at the time of establishing the Plan, then the LTM EBITDA of the Business at the time of the sale of the Business or IPO will be adjusted to reflect the higher EBITDA multiple received for the sale or disposition of such business unit. Annex B of the Plan provides an example of a sample adjustment calculation based on a hypothetical sale of a business unit.

OTHER CONSIDERATIONS

*Does my Unit Award change the at-will nature of my employment?*

No. The grant and the nature of vesting of the Units does not change the at-will nature of your employment with the Company, and you and the Company remain free to terminate the employment relationship at any time.

*How long will the Unit Award last?*

The Plan will have a five (5) year term, and all Units will be forfeited without payment on December 31, 2019 if neither a sale of the Business nor an IPO has occurred on or before that date.

*Will I be able to transfer the Unit Award?*

The Unit award is not transferable, except by will or the laws of inheritance or pursuant to beneficiary designation procedures established by the Company. If you should die before the sale of the Business or an IPO, payment with respect to the vested portion of your Units will be made to your estate or to a properly designated beneficiary.

*Are there any circumstances under which my Unit Award or payment pursuant to my Unit Award can be forfeited or recouped?*

Yes. If you engage in "Detrimental Activity" at any time during the "Restricted Period", your Unit award may be forfeited, and any payment in respect of your Units made in the twenty-four (24) months preceding the date on which such Detrimental Activity occurred, may be recouped by the Company. For purposes of this section, the term "Restricted Period" means the following, as applicable: (x) if you are employed to work in the United States, the period beginning with the grant of Units and ending on the later of (i) twelve (12) months after the termination of your employment and (ii) twelve (12) months after you are delivered any payment in respect of your Units; and (y) if you are employed outside of the United States, the period beginning with the grant of Units and ending on the date that the restrictive covenants that you are subject to expire. The term "Detrimental Activity" is defined in the Plan, and generally covers acts by you that breach or violate covenants or contractual arrangements with the Company and its affiliates, including non-competition and nonsolicitation covenants, or other acts by you that may damage the Company and its affiliates.

OPTION AND RSU SURRENDER

*Do I have to make an Option and RSU Surrender?*

Yes, if you own Altegrity Options and/or Restricted Stock Units and you want to accept a Unit award under the Plan, you must agree to the Option and RSU Surrender. You must make your own informed decision whether you want to surrender your vested and unvested Altegrity Options and/or your unvested Restricted Stock Units in order to accept your Unit award. We encourage you to seek advice from your tax, financial and legal advisors. No one from the Company is, or will be, authorized to provide you with advice or recommendation in this regard.

TAX CONSIDERATIONS

*What are the tax considerations regarding the Unit Award?*

Below is a summary of certain current United States Federal income tax considerations for residents of the United States relating to the Unit award. It is for general purposes only and does not present a complete analysis of all tax consequences that may be relevant to you. However, you should be aware that it may be that you are subject to tax in one or more other jurisdictions, or that different rules may apply to you even insofar as the United States is concerned. In addition, tax laws are subject to change and may differ from the description below at the time payment is made in respect of the Unit award. You are urged to consult your own tax advisor as to the Federal, state and local tax consequences to you of receiving the Unit award and receiving payments in respect of the Unit award. Neither the Company nor any of its subsidiaries or affiliates will compensate you in respect of taxes due in connection with the Unit award.

The Company intends that the Unit award will not be subject to Federal income tax or FICA and Medicare taxes at the time granted to you or upon vesting. You will recognize ordinary income with respect to your Unit award following a sale of the Business or an IPO when a payment is made to you in respect of your Units. If you are making an Option or RSU Surrender, we believe that, for U.S. Federal income tax purposes, your receipt of the Unit award should not be treated as a taxable exchange. Your Unit award is not intended to be subject to the deferred compensation rules set forth in Section 490A of the Internal Revenue Code.

**To ensure compliance with US Internal Revenue Service Circular 230, recipients of Units are hereby notified that any discussion of tax matters set forth in this summary was written in connection with the promotion or marketing of the Units and was not intended to be used, and cannot be used, by any recipient for the purpose of avoiding tax-related penalties under Federal, state, or local law.**

\*     \*     \*

# KROLL INC.
## LONG-TERM INCENTIVE PLAN

**Section 1.**    **Purpose.**   The purposes of the Kroll Inc. Long-Term Incentive Plan (the "**Plan**") are to promote the interests of Kroll Inc. (the "**Company**") and its stockholders by (i) attracting and retaining key employees of outstanding ability, (ii) motivating these employees by means of a performance-related incentive, and (iii) enabling these employees to participate in the growth and financial success of the Company. The Company intends to achieve these purposes through the award of Units which will be earned and paid in cash, based on the performance of the Kroll Operating Segment of Altegrity, Inc. (the "**Business**"), upon the occurrence of a Triggering Event under the Plan.

**Section 2.**    **Administration**

(a)    Administration.   The Board of Directors of Altegrity, Inc. (the "**Board**") shall be responsible for the administration of the Plan.

(i)    Any Units granted by the Board may be subject to such conditions, not inconsistent with the terms of the Plan, as the Board shall determine, in its sole discretion.

(ii)    The Board shall have discretionary authority to prescribe, amend and rescind rules and regulations relating to the Plan, to provide for conditions deemed necessary or advisable to protect the interests of the Company and/or its stockholders, to interpret the Plan and to make all other determinations necessary or advisable for the administration and interpretation of the Plan and to carry out its provisions and purposes. Any determination, interpretation or other action made or taken (including any failure to make any determination or interpretation, or take any other action) by the Board pursuant to the provisions of the Plan shall be final, binding and conclusive for all purposes and upon all persons and shall be given deference in any proceeding with respect thereto.

(iii)    The Board may consult with legal counsel and other advisors, and shall not incur any liability for any action taken in good faith in reliance upon the advice of counsel. The Board shall have sole discretion to determine which legal counsel and other advisors to retain.

(b)    Delegation.   The Board may delegate its authority to a committee of the Board, and/or to officers or employees of the Company or its affiliates, subject to such terms as the Board shall determine; provided that no officer or employee may exercise

any discretion over the amount that he or she may be paid under the Plan or to the determination of LTM EBITDA or the Adjusted Base Price.

Section 3.     **Grants of Units**

(a)     Grants of Units. Awards under the Plan shall consist of a specified number of notional units, each of which shall have a base price specified in the applicable Participation Notice (each, a "**Unit**", and the base price applicable thereto, the "**Base Price**"). Unless the Board shall determine otherwise in connection with the grant of Units, the Base Price of a Unit shall be One Dollar ($1.00). The Board shall, in its absolute discretion, select the employees of the Company and its affiliates whose services relate to the Business who are to be granted Units under this Plan (the employees to whom Units are granted are referred to in the Plan as "**Participants**"). The Board shall also, in its absolute discretion, determine the number of Units and Base Price to be granted to each Participant and the other terms and conditions applicable to such Unit award, provided that such other terms and conditions are not inconsistent with an express provision of the Plan. Each Unit award shall be evidenced by a "**Participation Notice**", substantially in the form attached to the Plan. The date as of which the Units will begin to vest (the "**Vesting Commencement Date**") shall be the date of grant of the Units or such earlier date as is indicated on the applicable Participation Notice.

(b)     Restrictive Covenant Agreement; Cancellation of Stock Options and Unvested Restricted Stock Units. As a condition to participation in the Plan and the grant of any Units to a Participant, the Participant shall (i) execute and return to the Company an agreement containing covenants relating to confidentiality, non-competition and non-solicitation in such form as is in use by the Company and its affiliates from time to time, or as otherwise provided in the applicable Participation Notice and (ii) agree to the cancellation without payment or compensation of any stock options (both vested and unvested) and unvested restricted stock units that were granted to the Participant under the Amended and Restated Altegrity Holding Corp. Stock Incentive Plan and are then held by the Participant.

**Section 4. Vesting Conditions**

(a)     In General. Unless otherwise determined by the Board and set forth in the applicable Participation Notice, and except as provided in Section 4(b), each Unit award granted to a Participant under the Plan shall become vested as follows, subject to the Participant's continued employment with the Company or any of its affiliates through the applicable date:

(i) 25% of the Units shall become vested on the first anniversary of the Vesting Commencement Date;

2

(ii) an additional 25% of the Units shall become vested on the second anniversary of the Vesting Commencement Date;

(iii) an additional 25% of the Units shall become vested on the third anniversary of the Vesting Commencement Date; and

(iv) the remaining 25% of the Units shall become vested on the fourth anniversary of the Vesting Commencement Date.

Each of the dates on which a portion of the Units becomes vested, either pursuant to the immediately preceding sentence or otherwise pursuant to Section 4, is referred to in the Plan as a "**Vesting Date**." The percentage of the Units on any date that is not yet vested on such date is referred to in the Plan as the "**Unvested Percentage**". The percentage of the Units that has become vested as of any date is referred to in the Plan as the "**Vested Percentage**".

(b)  Effect of Continued Employment Through the Triggering Event. Unless otherwise determined by the Board and set forth in the applicable Participation Notice, any unvested portion of a Participant's Units shall become fully vested as of the date on which the Triggering Event occurs, so long as the Participant has remained continuously employed from the date of grant of the Units through the date of the Triggering Event.

(c)  Definition of Triggering Event. For purposes of the Plan, a "**Triggering Event**" includes the first to occur following the date of adoption of the Plan and prior to the Expiration Date of a Sale of the Business or an Initial Public Offering. In the event that a Triggering Event occurs, no subsequent action or event shall constitute a Triggering Event.

(i)  An "**Initial Public Offering**" means an initial public offering pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission that covers the Business such that, after the closing of such public offering, equity securities relating to the Business will be traded on the New York Stock Exchange, the American Stock Exchange or the National Association of Securities Dealers Automated Quotation System or any comparable non-U.S. exchange or system.

(ii)  A "**Sale of the Business**" means the consummation of an acquisition by a Third Party of all or substantially all of the assets that comprise the Business in a transaction (e.g., a sale, merger, transfer or other disposition) that is (A) an acquisition of all or substantially all of the assets of the Company from the Company, (B) an acquisition of all or substantially all of the equity securities of the Company from the Persons that own such equity securities, (C) an acquisition of all or substantially all of the equity securities of Altegrity, Inc.

3

from Altegrity Holding Corp. or (D) an acquisition of all or substantially all of the securities of Altegrity Holding Corp. from the Providence Entities, excluding in all cases (I) an Investor Transaction and (II) for avoidance of doubt, the original issuance by a Person of its own equity securities.

For purposes of this definition:

"**Altegrity Entities**" means Altegrity, Inc. or any of its affiliates.

"**Investor Transaction**" means the direct or indirect acquisition of equity securities or assets of the Company by a Person that is, or by a group that includes, a holder of loans or debt securities of Altegrity Holding Corp. or any of its affiliates.

"**Person**" means any natural person, firm, partnership, limited liability company, association, corporation, company, trust, business trust, governmental authority or other entity.

"**Providence Entities**" means Providence Equity Partners VI L.P., a Delaware limited partnership ("**PEP VI**"), Providence Equity Partners, L.L.C. and any of their affiliates or any other investment fund or similar fund managed or advised by PEP VI or Providence Equity Partners, L.L.C.

"**Third Party**" means a Person or group (as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) other than any of the Providence Entities or Altegrity Entities.

(d)     Accelerated Vesting.   The Board may, in its discretion, accelerate the vesting of any Units granted under the Plan at any time and for any reason.

**Section 5.       Termination of Employment; Post-Employment Competition; Effect of Detrimental Activity**

(a)     Termination for Any Reason other than Cause.   If, prior to the final Vesting Date, a Participant's employment terminates for any reason other than by the Company for Cause as set forth in Section 5(b), (i) the Unvested Percentage of the Units then held by such Participant (if any) shall be forfeited as of the date the Participant's employment terminates without payment therefor, and the Participant shall not be entitled to any compensation for the loss of any rights or benefits in relation to such Units or otherwise under the Plan; (ii) the Participant shall retain his or her Vested Percentage of Units; and (iii) payment, if any, in respect of such Vested Percentage of Units shall be made as provided in Section 6.

(b)     Termination of Employment for Cause.  Unless otherwise determined by the Board and set forth in the applicable Participation Notice, in the event of a Participant's termination of employment by the Company for Cause, the Vested Percentage and Unvested Percentage of the Units then held by the Participant shall be forfeited without payment as of the date the Participant's employment terminates, and the Participant shall not be entitled to any compensation for the loss of any rights or benefits in relation to such Units or otherwise under the Plan.  For purposes of this Plan, if a Participant is a party to an employment or individual severance agreement with the Company that defines the term "Cause" then, with respect to any Units granted to such Participant, "Cause" shall have the meaning set forth in such agreement.  Otherwise, "**Cause**" means (i) the willful refusal or gross neglect of the Participant to perform substantially his employment-related duties, of which refusal or neglect the Participant is notified in a writing reasonably describing the refusal or neglect and the same is not cured within thirty (30) days after the effective date of the notice, (ii) the Participant's willful and deliberate acts of misconduct or breach of fiduciary duty or other act justifying immediate dismissal under the Participant's employment agreement or other incorporated terms and conditions of employment (if any), (iii) the Participant's conviction of or entering a plea of guilty or *nolo contendere* (or any applicable equivalent thereof) to a crime constituting a felony (or a crime or offense of equivalent magnitude in any jurisdiction outside of the United States) or his willful violation of any other law (other than a traffic violation or other offense which has no material adverse effect on the Company or any of its affiliates or its or their reputation or the ability of the Participant to perform his employment-related duties or to represent the Company or any of its affiliates), or (iv) the Participant's engaging in a Detrimental Activity, of which Detrimental Activity the Participant is notified in a writing reasonably describing the Detrimental Activity and, provided the Detrimental Activity is capable of being cured, the same is not cured within thirty (30) days after the effective date of the notice.  In addition to the foregoing, Cause shall include any item that is deemed to be Cause under applicable law of the country in which the Participant is employed and, of the foregoing clauses, shall exclude any item that cannot be treated as an event of Cause under applicable law of the country in which the Participant is employed.  For purposes of this Plan, "**Detrimental Activity**" includes the following activities in the country in which a Participant is employed: (i) directly or indirectly providing services to, becoming employed or engaged by, providing material assistance to or otherwise carrying on a business that is, or is taking steps to prepare to be, in competition with the business of the Company or any of its affiliates in the United States or any other country where the Company or any of its affiliates does business; (ii) soliciting or knowingly inducing an employee of the Company or any of its affiliates to leave the employment of his or her employer or assisting another party to do so; (iii) breaching the post-termination restrictive covenants included in the Participant's employment agreement or other agreement incorporated in the Participant's terms and conditions of employment, if applicable (which covenants (only) are hereby expressly incorporated by reference into the Plan), or the restrictive covenant agreement referred to in Section 3(b) of the Plan or

otherwise in the Participation Notice; (iv) breaching or violating any other covenant, agreement or contractual obligation with the Company or any of its affiliates (including, if applicable, but not limited to the Confidentiality, Non-Solicitation and Proprietary Rights Agreement (the "**CNPR Agreement**")) or otherwise disclosing, using or divulging confidential information belonging to the Company or any of its affiliates; (v) violating the Company's code of conduct; or (vi) engaging in any act of fraud, embezzlement, dishonesty, or intentional wrongdoing, whether by commission or omission, which adversely affects the business or affairs of the Company in a material manner. For purposes of this Section 5(b), no act, or failure to act, on the Participant's part shall be considered "willful" unless he or she has acted or failed to act with an absence of good faith and without a reasonable belief that his action or failure to act was in the best interests of the Company.

(c)     _Restricted Period_. In the event that the Board determines that a Participant has engaged in a Detrimental Activity at any time during the Restricted Period, of which Detrimental Activity the Participant is notified in a writing reasonably describing the Detrimental Activity and the same is not cured (if determined by the Board to be curable) within thirty (30) days after the effective date of the notice, the Board may (i) effect the forfeiture of the Vested Percentage of the Units then held by the Participant without payment therefor and (ii) recoup from the Participant any payment in respect of the Units made in the twenty-four (24) months preceding the date on which such Detrimental Activity occurred. For purposes of this Section 5(c), the "Restricted Period" means the following, as applicable: (x) as to Participants employed to work in the United States, the period beginning with the grant of Units and ending on the later of (i) twelve (12) months after the termination of Participant's employment and (ii) twelve (12) months after the Participant is delivered any payment in respect of his Units; and (y) as to Participants employed outside of the United States, the period beginning with the grant of Units and ending on the date that the restrictive covenants the Participant is subject to expire (the "**Restricted Period**").

**Section 6.      Calculation and Payment of Unit Payments**

(a)     _Calculation of Per Unit Payment_. Upon the occurrence of a Triggering Event, each Participant shall be entitled, in respect of the Vested Percentage of the Participant's Units, to a payment per Unit equal to the Base Price as adjusted (up or down) that corresponds to the LTM EBITDA in the table attached as Annex A (the "**EBITDA Table**", and the Base Price as adjusted, the "**Adjusted Base Price**"). The Adjusted Base Price shall be based on the EBITDA Table, with the Adjusted Base Price in excess of the lowest stated Adjusted Base Price and less than the highest stated Adjusted Base Price and falling between two contiguous Adjusted Base Prices in the EBITDA Table to be determined by linear interpolation. In the event that the LTM EBITDA is higher than the highest LTM EBITDA specified in the EBITDA Table attached as Annex A, the Board will consider whether and to what extent the Adjusted

Base Price should be further adjusted above the highest stated Adjusted Base Price. For avoidance of doubt, the Adjusted Base Price, when determined, shall replace the Base Price and shall not be added to the Base Price.

(b)     <u>Adjustment for Early Exit of a Division</u>.  If there shall occur the sale or other disposition prior to the Triggering Event of a reasonably identifiable business unit of the Company, the LTM EBITDA for that business unit at the time of the sale or disposition will be taken into account for purposes of determining the LTM EBITDA of the Business at the time of the Triggering Event as provided in this Section 6(b) and Annex A. If the business unit is sold or disposed of at an EBITDA multiple that is higher than the expected EBITDA multiple established by the Company in connection with such sale or disposition at the time of establishing the Plan, then the LTM EBITDA of the Business at the time of the Triggering Event will be adjusted for the higher EBITDA multiple rather than the actual LTM EBITDA for that business unit. Annex B provides an example of a sample adjustment calculation based on a hypothetical sale of a division.

(c)     <u>Timing of Payment</u>.  Payments in respect of Units under the Plan shall be paid within thirty (30) days following the date of the applicable Triggering Event.

(d)     <u>Form of Payment</u>.  All payments under the Plan shall be paid in cash.

**Section 7.     <u>Expiration</u>**.  If a Triggering Event has not occurred on or prior to December 31, 2019, this Plan shall terminate on such date and the Participant's Units shall be automatically cancelled and forfeited without payment.

**Section 8.     <u>Amendment and Termination</u>.**  The Board may at its discretion at any time and from time to time alter, amend, suspend, or terminate the Plan and any Participation Notice; <u>provided, however</u>, that no such alteration, amendment, suspension or termination shall have a substantial adverse effect on any then outstanding Units without the consent of the affected Participant.

**Section 9.     <u>Designation of Beneficiary</u>.**  A Participant may at any time designate a beneficiary solely for the purposes of this Plan (subject to such limitations as to the classes and number of beneficiaries and contingent beneficiaries and such other limitations as the Board may from time to time prescribe) or revoke or change any designation of beneficiary; <u>provided</u>, that only one change per calendar year shall be permitted.  No such designation shall be valid unless in writing and signed by the Participant, dated and filed with the Company. Any such designation shall be controlling over any testamentary or other disposition. In the case of a failure of a designation or the death of a beneficiary without a designated successor, distribution shall be made to the legal representative of the Participant, in which case, the Company, the Board and any members thereof shall not be under any further liability to any other person.

### Section 10.   Miscellaneous Provisions

(a)   Withholding.   The Company shall have the right to deduct from all amounts payable to a Participant (whether under this Plan or otherwise) any amount of taxes required by law to be withheld in respect of Units or any amounts under this Plan as may be necessary in the opinion of the Company to satisfy tax withholding required under the laws of any country, state, province, city or other jurisdiction, including but not limited to income taxes, capital gains taxes, transfer taxes, and social security contributions that are required by law to be withheld.

(b)   Nontransferability.   No Participant may transfer his or her interest in or rights under the Plan and no such interest or right shall be assignable or transferable except by will or the laws of descent and distribution or as expressly permitted by the Board. Except to the extent required by law, no right or interest of any Participant shall be subject to any lien, obligation or liability of the Participant.

(c)   No Limitation on Compensation.   Nothing in the Plan shall be construed to limit the right of the Company to establish other plans or to pay compensation to its employees, in cash or property, in a manner which is not expressly authorized under the Plan.

(d)   Rights of Participants.   Anything to the contrary notwithstanding, nothing contained herein shall be deemed to create a trust of any kind or create any fiduciary relationship. To the extent that any person acquires the right to receive payments from the Company under this plan, such right shall be no greater than the right of any unsecured general creditor of the Company.

(e)   No Right to Employment.   No person shall have any claim or right to be granted Units under this Plan, and the grant of Units shall not be construed as giving a Participant the right to be retained in the employ of the Company or its affiliates. The grant of Units under the Plan is entirely voluntary, and at the complete discretion of the Company. The grant of Units by the Company shall under no circumstances be deemed to create any obligation to grant any further Units, whether or not such a reservation is explicitly stated at the time of such a grant. The Plan shall not be deemed to constitute, and shall not be construed by the Participant to constitute, part of the terms and conditions of employment and participation in the Plan shall not be deemed to constitute, and shall not be deemed by the Participant to constitute, an employment or labor relationship of any kind with the Company. The Company reserves the right at any time to dismiss a Participant free from any liability, or any claim under the Plan, except as provided herein and in any Participation Notice. The Company expressly reserves the right to require, as a condition of participation in the Plan, that Participants agree and acknowledge the above in writing. Further, the Company expressly reserves

8

the right to require Participants, as a condition of participation, to consent in writing to the collection, storage and use of personal data for purposes of administering the Plan.

(f)     Construction of the Plan.   The validity, construction, interpretation, administration and effect of the Plan and of its rules and regulations, and rights relating to the Plan, shall be determined solely in accordance with the laws of the State of New York (without reference to the principles of conflicts of law).

(g)     Indemnification. Each person who is or shall have been a member of the Board and each delegate of the Board shall be indemnified and held harmless by the Company against and from any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by him or her in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be made a party or in which he or she may be involved in by reason of any action taken or failure to act under the Plan and against and from any and all amounts paid by him or her in settlement thereof, with the Company's approval, or paid by him or her in satisfaction of any judgment in any such action, suit, or proceeding against him or her, provided that the Company is given an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it personally.   The foregoing right of indemnification shall not be exclusive and shall be independent of any other rights of indemnification to which such persons may be entitled under the Company's governing documents, by contract, as a matter of law, or otherwise.

(h)     No Impact on Benefits.   Except as may otherwise be specifically stated under any employee benefit plan, policy or program, no amount payable in respect of any Units or otherwise under the Plan shall be treated as compensation for purposes of calculating a Participant's right under any such plan, policy or program.

(i)     No Constraint on Corporate Action.   Nothing in this Plan shall be construed (i) to limit, impair or otherwise affect the Company's right or power to make adjustments, reclassifications, reorganizations or changes of its capital or business structure, or to merge or consolidate, or dissolve, liquidate, sell, or transfer all or any part of its business or assets or (ii) to limit the right or power of the Company, or any affiliate of the Company, to take any action which such entity deems to be necessary or appropriate.

(j)     Short-Term Deferral.   It is intended that payments under the Plan constitute short-term deferrals under Treas. Reg. § 1.409A-1, and the Plan shall be interpreted and administered accordingly.

(k)     Rules of Construction.

9

(i)  <u>Gender and Number</u>.  Except when otherwise indicated by the context, words in the masculine gender used in the Plan shall include the feminine gender, the singular shall include the plural, and the plural shall include the singular.

(ii)  <u>Use of the term "Employ"</u>.  The phrase "employment with the Company" and corollary terms used herein and in a Participation Notice with respect to a Participant shall be construed to refer to the employment with the Company and/or the affiliates of the Company that actually employ the Participant.  For purposes of this Plan, unless the Board determines otherwise or applicable law requires otherwise, (1) the transfer of employment of a Participant as between the Company and any of its affiliates shall not be treated as a termination of employment, and (2) if a Participant ceases to be an employee but continues to provide services to the Company or an affiliate in any capacity, his or her "employment" shall be deemed to continue during the provision of such services.

(iii)  <u>Termination of Employment</u>.  It shall be condition of each grant of Units under the Plan that the date of termination of a Participant's employment shall be determined without regard to any statutory or deemed or express contractual notice period, unless otherwise required by law.

(iv)  <u>Headings and Captions</u>.  The headings and captions herein are provided for reference and convenience only, shall not be considered part of this Plan, and shall not be employed in the construction of this Plan.

10

Annex A
**EBITDA Table (Kroll Operating Segment)**

| LTM EBITDA | Adjusted Base Price |
|---|---|
| ██████████ | $0 |
| ██████████ | $0.20 |
| ██████████ | $1.00 |
| ██████████ | $1.75 |
| ██████████ | $2.50 |
| ██████████ | $3.00 |
| ██████████ | $3.25 |

"**LTM EBITDA**" means the earnings of the Business before interest, taxes, depreciation and amortization, for the twelve (12) full calendar months immediately preceding the calendar month in which the Triggering Event occurs. In addition to the adjustments contemplated by Section 6(b), the Board shall make further adjustments to the calculation of LTM EBITDA to reflect the following: acquisitions, divestitures, major capital programs, any stock option or other stock-based compensation charges, fees or expenses related to any equity offering or repayment or refinancing of indebtedness approved by the Board. The Adjusted Base Prices will be equitably adjusted by the Board for any acquisitions, divestitures or major capital investment programs not currently contemplated, to the extent permitted under U.S. generally accepted accounting principles and applicable law. The Board shall make all determinations with respect to any of the foregoing adjustments and with respect to calculating the amount of the bonuses to be paid under the Plan (including, without limitation, as contemplated by Section 6(b)), which determinations shall be final, binding and conclusive on all persons having or claiming any right under the Plan.

**Annex B**
**Adjustment for Early Exit of a Division**

- In order to account for an early sale of a division at potentially attractive multiples, the EBITDA Table would be adjusted to reflect the achievement of a higher implied EBITDA based on the net sale proceeds (i.e. taking into account corporate taxes).

- Using Business Unit A ("**A**") as an example, if the Company receives an attractive price for "A" even if "A" has not achieved significant EBITDA growth, actual EBITDA achieved for purposes of the Plan upon the sale of "A" would reflect the higher implied EBITDA (in this example, at an assumed Company multiple of █).

- If, however, the valuation implies a lower EBITDA, the actual EBITDA figure at the time of the sale of "A" would be used in determining the Adjusted Base Price.

| Illustrative EBITDA Adjustment for Early Sale of Division | | |
|---|---|---|
| Actual "A" EBITDA at Exit | ███ | ███ |
| Illustrative Sale Value | ███ | ███ |
| Less: Estimated Corporate Taxes | ███ | ███ |
| Net Proceeds | ███ | ███ |
| Assumed Kroll Multiple | ███ | ███ |
| Implied "A" EBITDA at Exit | ███ | ███ |
| Assumed "A" EBITDA for LTIP | | |
| Illustrative EBITDA for Remaining Kroll at Exit | ███ | ███ |
| "Achieved" "A" EBITDA | ███ | ███ |
| Total Kroll EBITDA for LTIP Payout | ███ | ███ |
| Actual EBITDA Achieved | ███ | ███ |

12